IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jason Blesedell,

                Plaintiff,

      v.

Chillicothe Telephone Co., et al.,

                Defendants.

Case No: 2:13-cv-451

Judge Graham

<u>Opinion and Order</u>

This action is brought by plaintiff Jason Blesedell under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Plaintiff alleges that his former employer, defendant Chillicothe Telephone Company ("CTC"), violated its collective bargaining agreement when it discharged him on December 17, 2012 without just cause.  He further alleges that defendant International Brotherhood of Electrical Workers, Local Union No. 578 breached its duty of fair representation in the course of the grievance process.  Also named as a defendant is Eric Stevens, who is the Human Resources Manager at CTC.  Stevens is alleged to have made defamatory statements about Blesedell to a local law enforcement officer and to Union officials.

 This matter is before the court on defendants' motions for summary judgment.  For the reasons stated below, the motions are granted in their entirety.

I. **Summary of the Facts**

    A. **General Background**

Blesedell began his employment with CTC in 1996 and thereafter became a member of Local Union 578.  (Blesedell Dep. at 17, 18, 21).  He became a plant facilities technician in 2011, and in that position he performed installation and repair work on telephone cables and equipment.  (Id. at 20-21).  Blesedell worked primarily with copper lines, as opposed to fiber lines, and was considered a "copper technician".  (Parker Dep. at 35-36).  He also located and marked CTC lines, in connection with the Ohio Utilities Protection Service's "call before you dig" program.  (Blesedell Dep. at 158); <u>see</u> <u>also</u> O.R.C. § 3781.28.

Blesedell reported to supervisor Gerald Parker, a field operations manager.  (Parker Dep. at 18, 28).  Parker supervised about 39 technicians, and he worked out of a physical office located on Orange Street in Chillicothe, Ohio.  (Id. at 33-34).

Blesedell and other technicians generally reported to "the Exchange" in Massieville, Ohio at the start of the day.  At the Exchange, he would connect to the internet and receive daily tasks in the form of "tickets" or "trouble tickets" that contained information regarding the repair and maintenance work he was being assigned to perform.  (Blesedell Dep. at 65; Parker Dep. at 129).  Technicians often returned to the Exchange during lunch, and they returned again at the end of the day to submit timecards.  (Parker Dep. at 129).  Technicians called into dispatchers at a service center to report when they had "cleared" a ticket.  (Id. at 90; Blesedell Dep. at 80-81).  When a matter arose that needed immediate attention, Parker would call a technician directly to assign him work.  (Parker Dep. at 89).

### B.    Uncertainty over Blesedell's Schedule and the Work He Performed on December 4, 2012

Parker often would schedule copper technicians to receive on-the-job "fiber training" with a fiber technician.  (Parker Dep. at 44-45, 49).  Parker believed that he had scheduled Blesedell to do fiber training for the week of Monday, December 3, 2012.[1]  (Parker Dep. at 51, 58).

Blesedell testified that he was unaware that he had been scheduled for fiber training until service center dispatcher Vicki Haney called him at 12:48 p.m. on December 3.  (Blesedell Dep. at 64; Coe Dep. at 60[2]).  During the call, Haney told Blesedell that another dispatcher, Kim Barnes, "thought you were in fiber training."  (Coe Dep. at 60).  Blesedell responded that he did not know about the fiber training and asked Haney to check the schedule because, as Blesedell put it, "It's very

---

[1]    Parker testified that he posted a fiber training schedule at CTC's Orange Street facility and sent an email, with the schedule attached, to the technicians and to service center dispatchers. (Parker Dep. at 51-54).  The email itself, without the attachment, was produced during discovery, (Parker Dep., Ex. 61), but defendants were unable to locate a copy of the schedule.  (Parker Dep. at 53-54).

[2]    Calls with the service center were routinely recorded, and, with one notable exception discussed below regarding Massieville resident Brad Carroll, the parties do not dispute the identity of the individuals participating in the recorded calls, nor do they dispute the accuracy or completeness of the content of the recordings.  The court has been provided with audio file copies of the recordings relevant to this case.  For the sake of convenience, the court's citations to these recordings will be, whenever possible, to the pages of various depositions in which the recordings were played and transcribed.

important." (Id. at 60-61).  Haney confirmed that Blesedell was on the schedule and commented, "You may want to call Gerald [Parker]." (Id. at 61).

At 1:10 p.m. on December 3, 2012, Blesedell called another dispatcher, Linda Mitchell, with whom he had been in contact earlier in the day regarding a trouble job he was performing.  Blesedell told Mitchell that Haney had just informed him that he was supposed to be in fiber training, and he told Mitchell that he had no idea about being scheduled for training.  (Coe Dep. at 68).  Blesedell also told Mitchell, "If they ask, just let them know you put me on trouble." (Id. at 69).

At some point during the afternoon of December 3 or the morning of Tuesday, December 4, or perhaps on both days, Parker and Blesedell were in contact with each other.  Parker instructed Blesedell to continue working on trouble tickets and told him that he would do fiber training "later on in the week." (Blesedell Dep. at 90; Parker Dep. at 72, 76; Coe Dep. at 78-80).

In the morning of December 4, Blesedell completed a trouble ticket with another technician, Mike Causey.  (Blesedell Dep. at 77-78; Blesedell Dep., Ex. 10).  Blesedell then called the service center and spoke with Mitchell at 11:39 a.m. and had the following conversation, in relevant part:

> Blesedell: Did you have any locates [referring to a job locating wires] or anything down here that you need me to check up on?  I got ahold of Gerald.  He said he's going to get with – I'm in fiber training this week.
>
> Mitchell: Yep.
>
> Blesedell: So they got some orders and stuff and I told him [Gerald Parker] we had, me and Mike Causey worked on this down here.
>
> Mitchell: I think they sent Greg Bowdle down there to cover trouble.  I don't see any locates.
>
> Blesedell: Okay, I just wanted to check.  I'm going to eat and I'm just kind of waiting on his call.  I'll just deal with it as we go.  If you need anything though, call me.  If I'm around here local, I'll take care of it.
>
> Mitchell: I will, okay.

(Blesedell Dep. at 43).

At 3:06 p.m. on December 4, dispatcher Barnes called Parker and asked if Blesedell was supposed to be in fiber training.  (Coe Dep. at 30).  Barnes stated that she had given Greg Bowdle all of Blesedell's trouble tickets, "[s]o I don't know what he [Blesedell] was doing." (Id. at 30-31).  Parker responded that Blesedell had spent the morning helping Mike Causey and that the dispatchers should "keep him rolling" on trouble tickets.  (Id. at 31-32).  Parker stated that if

Blesedell was "not doing something, I need to know." (Id. at 32). Barnes responded, "I don't want to say for sure, but from what I can see, no." (Id.). Parker formed the impression from his conversation with Barnes that Blesedell was trying to avoid doing trouble tickets. (Parker Dep. at 79). Parker then called Blesedell to remind him that he should be working on trouble tickets. (Id. at 76, 80). Blesedell denied that he was refusing to do trouble tickets. (Id.).

After talking to Parker, Blesedell called dispatcher Mitchell at 3:37 p.m. on December 4. Blesedell said that he had just spoken with Parker and would not be doing fiber training until the end of the week. (Coe Dep. at 84). And he said that he would call in to the service center the next morning to get a trouble ticket. (Id.).

After talking to Blesedell, Parker met with CTC Human Resources Manager Eric Stevens later in the afternoon on December 4 concerning a different matter. (Parker Dep. at 108). Parker mentioned that he had received the phone call from Barnes and stated that Blesedell had denied refusing to do trouble. (Id. at 108-09). Parker informed Stevens that he had previously instructed Blesedell to work on trouble tickets until the end of the week, when he was to do fiber training. (Id. at 111).

This conversation with Parker caused Stevens to listen to the phone call between Blesedell and Mitchell. (Stevens Dep. at 127). From listening to the call, Stevens did not form the impression that Blesedell was refusing to do work, but he did become curious about what work, if any, Blesedell performed on the afternoon of December 4. (Id. at 127-28 ([I]f the perception [on the dispatcher's part] was not to send him any work, then what work did he do on the 4th[?]")). Stevens checked the timecard that Blesedell submitted at the end of the day. (Id. at 128). Blesedell put a code on the timecard indicating that he had done 4 hours of work in the afternoon on buried cable maintenance. (Id.; Blesedell Dep. at 44-45; Blesedell Dep., Ex. 6). Stevens, however, found no tickets to correspond with the work Blesedell reported having had performed on the afternoon of December 4. (Stevens Dep. at 128). Stevens became concerned that Blesedell "put down a [code] on his time card to say he did work that he did not do." (Id.).

Stevens next checked the records for the GPS unit on Blesedell's company truck. (Stevens Dep. at 130; Blesedell Dep., Ex. 11). The records showed that Blesedell's truck was parked at the Exchange for all but about 15 minutes during the afternoon of December 4. (Blesedell Dep., Ex. 11 at CTC00384). There was sometimes work to be performed at the Exchange, but it would have been reflected by a trouble ticket, and any buried cable work to be performed at the Exchange was outside of Blesedell's job classification. (Parker Dep. at 130-31).

C.        The December 14, 2012 Fact-Finding Meeting

Blesedell continued to report to work as usual.  CTC decided to conduct a fact-finding meeting on Friday, December 14, 2012 regarding a potentially falsified timecard.  (Kendall Dep. at 81).  Before the meeting, Stevens and Parker, along with CTC Talent Management Coordinator Debbie Coe and Executive General Manager of Operations Trevor Kendall met initially with Local Union 578 President Dave Morgan and Vice President Matt Ervin, outside of Blesedell's presence.  (Stevens Dep. at 177; Kendall Dep. at 78; Morgan Dep. at 77-78).  It is undisputed that during this initial meeting that CTC communicated its concern about Blesedell's work on December 4.  There is a dispute on the record about whether CTC stated its desire or intention to terminate Blesedell's employment.  (Morgan Dep. at 77-78 (testifying that CTC said that it wanted to terminate Blesedell); Ervin Dep. at 23 (testifying that CTC did not say that it wanted to terminate him)).

After the initial meeting with CTC, Morgan and Ervin talked briefly with Blesedell.  (Ervin Dep. at 27).  Again, there is some dispute about what Morgan and Ervin told Blesedell.  Morgan recalls telling Blesedell that CTC wanted to fire him.  (Morgan Dep. at 78).  Ervin recalls that they told him that CTC was concerned about his work on December 4.  (Ervin Dep. at 28-29).  Blesedell recalls only being told that there was a "situation" and that CTC was asking about the "validity of a job" Blesedell had reported doing.  (Blesedell Dep. at 54-55).

The fact-finding meeting was then held with Blesedell present, and it lasted for about 30 minutes.  (Blesedell Dep. at 56, 71).  CTC informed him that it was investigating his work on December 4 and that it had looked at the GPS records for his truck.  (Id. at 57).  CTC played the recording of Blesedell's phone call with Linda Mitchell and mentioned that it had reviewed the timecard he had submitted.  (Id. at 68, 72; Coe Dep. at 115-16; Morgan Dep. at 97-98).

When asked to account for the afternoon of December 4, Blesedell explained that he "possibly" was with technician Mark Tanner, that "maybe [he] was helping Mark."  (Blesedell Dep. at 68-69; Morgan Dep. at 90 (testifying that he understood Blesedell's explanation to be that he "worked with Mark Tanner in the afternoon"); Kendall Dep. at 69 (same)).  There was then a short break in the meeting during which CTC called Mark Tanner and obtained the GPS records from his truck.  (Coe Dep. at 128-29).  Tanner stated that he could not recall whether he worked with Blesedell on that day.  (Id. at 129; Blesedell Dep. at 69).  CTC's review of the GPS records for Tanner showed that he was not at the Exchange during the afternoon until the end of day at 4:00 p.m.  (Coe Dep. at 129; Stevens Dep. at 134-35).

After the break, Coe stated that CTC was unable to verify that Blesedell had worked with Tanner in the afternoon of December 4.  (Coe Dep. at 129; Parker Dep. at 131).  Blesedell then offered that he believed he had worked on a telephone "pedestal" that had been damaged in a car accident.  (Blesedell Dep. at 70-71; Coe Dep. at 129-30; Parker Dep. at 131-32).  CTC said it would look into whether Blesedell had worked on a pedestal and that there would be a follow-up meeting at the beginning of the next week.  (Coe Dep. at 129; Parker Dep. at 96-97).

According to Blesedell, the meeting came to an end with Kendall expressing his belief that the matter regarding Blesedell's work during the afternoon of December 4 "was a communication breakdown and that's all it was."  (Blesedell Dep. at 72).  Blesedell agreed with Kendall's analysis and offered to help as the investigation continued.  (Id. at 72-73, 129).  Morgan did not feel that any follow-up investigation needed to be done on his part – that the Union should await the next meeting and hear what CTC found in its follow-up investigation.  (Parker Dep. at 97-98).

### D. Events between the Fact-Finding Meeting and Blesedell's Termination

#### 1. Modification of a Ticket

Right after the fact-finding meeting on December 14, 2012, Blesedell went to the Exchange and called the Service Center and spoke with dispatcher Barnes at 3:13 p.m.  (Blesedell Dep. at 128-29, 355-56).  Blesedell asserts that his purpose in making the call was to find out if the Service Center had a ticket or record of the pedestal work he believed he had performed on December 4.  (Id.).  During the call, Blesedell asked Barnes if she could locate a ticket related to a "car accident on Massieville Road . . . we cleared it last week."  (Id. at 129).  "What happened was there was a car wreck and somebody came to the Exchange, it's walking distance from the Exchange . . . and [the wreck] wiped out four mailboxes, the guard rail, and one of our big pedestals."  (Id. at 130).  Blesedell continued, "I need all the info because Gerald was asking me what I took care of, but thing was we didn't have a ticket on it until we made it up and I think we made it up after it was done."  (Id.).

Barnes told Blesedell that she had found a ticket for "Damaged ped at the 2500 block of Massieville Road//auto accident," to which Blesedell said, "Right."  (Blesedell Dep. at 131).  Barnes noted that the ticket had been created on Sunday, December 9 and cleared by Blesedell on December 10.  (Id.).  Blesedell then stated that "actually we did it on the 4th" and asked Barnes to "put the notes on there it was actually damaged on the 4th" and "was repaired on the 4th."  (Id. at 133).  Blesedell then explained to Barnes that the dispatcher who had entered the ticket, Gloria Reisinger, probably was taking care of catching up on her work and had entered and cleared the

ticket after-the-fact because he believed that the pedestal had been damaged and repaired on December 4. (Id. at 133-34). The conversation ended with Barnes stating that she was able to change the ticket to reflect that the damage and repair of the pedestal had taken place on December 4. (Id. at 134). The ticket thereafter showed the original entry and clearance information of December 9 and 10, and it contained a note that the "ped was damaged on Dec. 4th and repaired Dec. 4th in afternoon." (Barnes Dep., Ex. 23).

### 2. The Incident with Dustin Riehle

At approximately 4:36 p.m. on December 14, 2012, Blesedell called Stevens after he had left work and returned home. (Blesedell Dep. at 154-55). Blesedell brought up two subjects. First, he explained that the pedestal on Massieville Road had been hit twice but "the records didn't reflect that." (Id. at 155). He also told Stevens about an encounter he had just had with someone at the Exchange. When Blesedell left the Exchange for the day in his truck, he pulled around in the parking lot of a nearby business, called Mega Surplus, to return to the Exchange and check if he had locked a door. (Blesedell Dep. at 145-47). In the Mega Surplus lot, Blesedell saw a person "from a distance, I thought he was saying hello from a distance, so I waved back to him and went down to the Exchange." (Id. at 147). Back at the Exchange, Blesedell saw two individuals he recognized, who had pulled up in their car to ask him about getting a television antenna. (Id.). "[A]bout that time a little gray truck slides in there and out comes this six-foot-three, 200-plus kid getting in my face screaming at me and making threats and saying I splashed him with water [at the Mega Surplus]." (Id. at 147-48). Blesedell backed away because the individual was "very threatening" and Blesedell did not recognize him. (Id. at 148). The individual, and a passenger and child who remained in the truck, left after Blesedell pretended to use his phone to record the individual's actions. (Id. at 149).

Immediately prior to talking with Blesedell, Stevens had been made aware that CTC had received a call from an individual who identified himself as Dustin Riehle. (Stevens Dep. at 93). Stevens was in the midst of listening to a recording of Riehle's call when Blesedell called him. (Id. at 142). In the call, Riehle stated that he worked at Mega Surplus and that a truck (with identification numbers corresponding to Blesedell's truck) turned around at considerable speed in the Mega Surplus parking lot and splashed Riehle and his truck. (Stevens Aff., Ex. A).[3] Riehle stated that he followed the truck to the Exchange and found Blesedell with two individuals in a black Saturn,

---

[3] Unlike the case with other recorded calls, the court could not readily find a transcript of the conversation. The audio file of the Riehle call is Exhibit A to the affidavit of Stevens.

"snorting a pill." Riehle accused Blesedell of physically threatening him and of also "hooking people up on their cable too down there for pills." (Id.). Stevens called Riehle on Monday, December 17, 2012 and Riehle restated the allegations he had made on December 14. (Stevens Dep. at 139-40).

### 3. Investigation of Pedestal Work

At the end of the December 14 fact-finding meeting, Blesedell stated that he remembered having worked during the afternoon of December 4 on a pedestal that had been damaged in a car accident. Later in the day on December 14, Stevens began a review for any tickets relating to a pedestal being damaged in an accident. (Stevens Dep., Ex. 17). He found the ticket first entered by Gloria Reisinger on December 9 and cleared on December 10. (Id.; Stevens Dep. at 63-64). By that point, Blesedell had already made the phone call to Barnes in which he instructed her to modify the ticket. Thus, Stevens noted the discrepancy between the original entry dates and the modification stating that the pedestal was damaged and repaired by Blesedell on "Dec 4th in afternoon." (Stevens Dep., Ex. 5). He noted too that the clear date was listed as December 4 but the time of clearance was in the morning. (Id.).

Stevens then checked the phone recording that triggered the creation of the ticket on December 9 and also the call clearing the ticket on December 10. (Stevens Dep. at 64). It was Blesedell who had called to create the ticket on December 9, and he reported that there had been a "car accident at 2500 block of Massieville Road over the weekend and a guy took out mailboxes plus he hit one of our pedestals. . . . just make up a ticket and I'll bag it and stuff tomorrow." (Blesedell Dep. at 116). Blesedell called on December 10 and reported that he had completed replacing the pedestal." (Id. at 125-26).

Stevens and Coe knew that dispatchers were supposed to place their initials when changing a ticket, and the ticket relating to the pedestal had no such initials. (Coe Dep. at 156). Stevens and Coe contacted Reisinger, who had entered the ticket on December 9, and Haney, who frequently worked with Blesedell, to ask them if either of them had changed the ticket entered on December 9 and cleared the next day. (Stevens Dep. at 56; Coe Dep. 156). They both said that they had not altered the ticket. (Stevens Dep. at 56). Stevens and Coe did not talk to Barnes, as the modified ticket did not indicate her involvement. (Id.; Stevens Dep., Ex. 5). Stevens and Coe formed the opinion that Blesedell must have directly changed the ticket himself. (Stevens Dep. at 55; Coe Dep. at 156). They also believed that the work on the pedestal was actually performed on December 10 (as opposed to December 4), because the December 9 recording confirmed that the need for a ticket

to be created arose on December 9 and because there was no record or ticket relating to pedestal work having been done on December 4. (Stevens Dep. at 60, 64-65; Coe Dep. at 143).

### 4. Calls Received from "the Carrolls"

CTC received at least two telephone calls[4] in the late afternoon or early evening of Sunday, December 16, 2012 from someone identifying himself as "the Carrolls" on Moss Hollow Road. (Blesedell Dep. at 193-94). The caller stated that "I need you to write up a ticket because there was a truck that come through and hit some of the drops." (Id. at 194). The caller went on to specify that the accident had occurred two weeks prior, on Sunday, December 2 and that he had "flagged a fellow down on Tuesday the 4th" to work on the lines. (Id. at 194-95). The caller instructed the dispatcher several times to make sure the dates were put on the ticket. (Id. at 194-95 ("Can you make sure that's on there? . . . So make sure that they know some of them was completed on the 4th.")). The caller continued, "But if you just make sure they know we flagged him down, type that in there and he'll know that they got some of them. You know what I mean?" (Id. at 195). The caller clarified that some of the lines had slid back and that CTC should send someone back out on the next day. (Id. at 194-95). When asked his address, the caller did not give an exact location, but said that it was between 890 and 337 Moss Hollow Road. (Id. at 195).

A second call soon followed, again from someone identifying himself as the Carrolls. He asked the dispatcher for a ticket reference, and the dispatcher asked the caller to hold while she found the ticket number. (Blesedell Dep. at 196). While waiting, the caller volunteered that he had "went ahead and hung some of [the lines] up" himself. (Id. at 197). The dispatcher provided the caller with the ticket number and asked the caller for his phone number, but the caller declined to provide one and instead asked the dispatcher for a number for CTC he could call. (Id. at 197-98).

On Monday, December 17, 2012, Stevens was alerted to the recorded calls. A service center manager was concerned that the voice of the caller sounded like Blesedell's voice. (Stevens Dep. at 188; Coe Dep. at 151). Stevens, after listening to the calls, formed the belief that the caller was Blesedell. (Stevens Dep. at 76-81, 189-90). Coe, Kendall and Parker then all listened to the recordings and concurred that the caller sounded like Blesedell. (Coe Dep. at 151, 154-56; Kendall

---

[4]     The record contains three separate telephone recordings, but it appears possible that the second and third recordings constitute one phone call, with a break occurring when the dispatcher placed the caller on hold at the end of the second recording. (Blesedell Dep. at 196-97). The third recording begins not with a greeting, as was the case for the first two recordings, but with the dispatcher asking for the caller's cell phone number to list as a reference. (Id. at 197).

Dep. at 132-33; Parker Dep. at 138-41 (testifying that he was familiar with Brad Carroll's voice and that he felt the caller sounded like Blesedell)). As Kendall explained:

> [The caller] was using language or verbiage that is not typical of a customer, mentioning drops,[5] mentioning other things that are more technical in nature. . . . That person's voice sounded exactly like Jason Blesedell to me.
>
> During that call, this person also referenced a ticket or a date that was in question previously. They mentioned the 4th over and over in this call. Also made very clear, I want you to put this in the ticket; please make sure you put this in the ticket; don't forget to put this in the ticket.
>
> That seemed very odd.

(Kendall Dep. at 133).

### E. CTC Terminated Blesedell's Employment on December 17, 2012

CTC requested a meeting with Blesedell and the Union at 2:00 p.m. on Monday, December 17, 2012. (Blesedell Dep. at 201-02). Stevens began the meeting by informing Blesedell that he was being terminated.[6] (Stevens Aff., Ex. B). Stevens then explained that: CTC's records did not support his timecard entry or his explanation that he worked with Mark Tanner on the afternoon of December 4, CTC's records showed that the pedestal work following a car accident was performed on December 10 and not December 4, and CTC believed that the caller identifying himself as the Carrolls on December 16 was actually Blesedell. (Id.). Blesedell responded that: the pedestal had been hit three times, the caller was Brad Carroll, Carroll had flagged him down on the afternoon of December 4 to do work on his lines, and he believed he had told CTC that he had done work on December 4 for a customer who had flagged him down. (Id., Exs. B & C). CTC provided Blesedell with a letter of termination stating that CTC had reason to believe he was "falsifying records and impersonating customers to explain [his] time spent on December 4, 2012" and that his actions violated CTC's rule of conduct, including falsifying records. (Stevens Dep., Exs. 3, 4).

### F. The Grievance Process

#### 1. Initial Grievance Steps

---

[5] A "drop" is defined in the CBA as "a length of fiber or copper cable, aerial or buried, from the serving terminal to the point of demarcation at the customer premise." (Stevens Dep., Ex. 1, Art. 4(g)).

[6] The meeting was recorded by the Union, and the recording is submitted as Exhibits B and C to the Stevens Affidavit.

The Collective Bargaining Agreement provided for a multi-step grievance procedure. (Stevens Dep., Ex. 1, Art. 8.5). The Union immediately pursued the first and second steps of presenting the grievance to a supervisor and HR manager. On December 18 and 19, 2012 Morgan met with Stevens and requested that Blesedell be reinstated, a request Stevens denied. (Morgan Dep. at 120-22; Stevens Dep. at 203). Morgan also provided Stevens with a written request for CTC to produce documents regarding Blesedell's termination. (Id.). The request included Blesedell's personnel file, CTC's documentation (including audio recordings and copies of notes by managers and supervisors) relating to the termination, the identity of the individuals who participated in the termination decision, and the grounds for termination. (Stevens Dep., Ex. 8). CTC responded to the request and Morgan reviewed the evidence provided by CTC. (Morgan Dep. at 166; Morgan Dep., Ex. 34; Stevens Dep., Ex. 9).

The Union asked Blesedell to prepare a written statement presenting his version of events. (Blesedell Dep. at 225-26). Blesedell provided a statement, dated December 27, 2012, in which he explained that he did a job with Mike Causey in the morning of December 4 and that he understood from Parker that he would not be doing fiber training until the end of the week. (Blesedell Dep., Ex. 19 at LU000100). "I called [the] Service Center to ask for trouble tickets. Linda [Mitchell] said she would contact me for trouble." (Id.). He stated that he then went to the Exchange to wait to be contacted by Mitchell. "Meanwhile I shot trouble on 'C' box cable pairs. At this time, I was flagged down by Mr. Carroll, on Massieville Road, regarding a potential dangerous low-drop telephone wire at his residence on Moss Hollow Road. I removed and secured the drop to the pole. It took approximately 10-15 minutes." (Id.). He stated that he then returned to the Exchange to fill out a timecard. (Id.). A woman named Mrs. Mankin stopped at the Exchange and asked about switching providers – "I walked to her residence, which is next to the [Exchange], to confirm" whether CTC could provide service to her. (Id.). The statement contained no information regarding the work Blesedell had previously claimed to have performed on a pedestal on December 4. Turning to December 16, Blesedell stated that Carroll had come to Blesedell's house and was concerned about low lines; Blesedell let Carroll use his phone to place a call to CTC to get a ticket entered. (Id.).

In connection with his written statement, Blesedell obtained statements from Carroll and Mankin. Carroll stated that on December 4 he flagged down Blesedell to report low lines on his property and "made a report again on December 16, 2012 to the phone company." (Blesedell Dep., Ex. 19 at LU000101). Mankin stated that she stopped at the Exchange in the afternoon of

December 4 and asked Blesedell to check the wiring at her residence to see if she could change providers and that he walked to her residence and checked. (Id. at LU000102).

Blesedell also obtained a statement from Frank Robinson, who stated that he made contact with Blesedell at the Exchange on the afternoon of December 4. (Robinson Dep., Ex. 1). Robinson stated that he notified Blesedell of a damaged pedestal directly in front of his property and that Blesedell said "he would take a look at it while checking on Mrs. Mankin[']s lines who lives across the road." (Id.). Robinson saw Blesedell walk to the pedestal and perform the repairs. (Id.). Robinson also stated that the pedestal was damaged again on December 7 after being hit by a vehicle and that he called CTC about the damage. (Id.). Robinson did not provide his address, but stated that the pedestal was about 150 to 200 yards from the Exchange. (Id.).

During the grievance process, Morgan looked at the GPS records for Blesedell's truck and the address of Carroll's house on Moss Hollow Road and concluded that the records supported Blesedell's statement that he went to Carroll's house on December 4. (Morgan Dep. at 137). Morgan believed that it would have taken about 10 minutes for Blesedell to have fixed the low lines. (Id.). Morgan concluded that it made sense that the GPS records showed that Blesedell's truck left the exchange at 3:22 p.m., went to nearby Moss Hollow Road (about one mile away), and returned to the Exchange at 3:37 p.m. on December 4. (Morgan Dep. at 137; Blesedell Dep., Ex. 11 at CTC00384).

Morgan also checked out Blesedell's alleged work on the pedestal. Morgan found that Robinson lived at 2509 Massieville Road, and he went to the site of the pedestal. (Morgan Dep. at 39, 136). Morgan estimated that the pedestal was about one-tenth of a mile from the Exchange, which was located at 2410 Massieville Road. (Id. at 39, 134). Morgan understood Blesedell to be claiming that he walked to the pedestal on December 4, but Morgan thought it would be unusual for a technician not to take his truck and equipment to repair a pedestal. (Id. at 39-40). "[T]he pedestal is beside the road. So, typically, we take a truck, park it by a pedestal so we can put cones out and flashers, have all of our tools and everything with us, and that kind of protects you from oncoming traffic . . . ." (Id. at 40). Morgan formed the conclusion that Blesedell did not walk to the pedestal and that Robinson's statement was not truthful. (Id. at 136-37, 220).

Morgan also looked up Mankin's address and found it to be 2538 Massieville Road. (Morgan Dep. at 134). When looking at the pedestal site, Morgan noted that Mankin lived close to Robinson. (Id. at 136). Robinson's statement indicated that Blesedell had worked on the pedestal "while checking on Mrs. Mankin[']s lines who lives across the road." (Robinson Dep., Ex. 1).

Blesedell's written statement had said that he walked to Mankin's house upon returning to the Exchange after being at Carroll's house on December 4.  The GPS records showed that Blesedell returned to the Exchange at 3:37 p.m. and left for the day at 4:04 p.m.  (Blesedell Dep., Ex. 11 at CTC00385).  Morgan did not believe that Blesedell could have walked to Mankin's house, checked her lines, fixed the pedestal, and returned to the Exchange in that 27-minute time frame.  (Morgan Dep. at 137-39 (testifying that Blesedell also would have filled out his timecard in that span)).

As to the phone calls on December 16 from a caller identifying himself as the Carrolls, Morgan believed that the caller on each of the recordings sounded like Blesedell.  (Morgan Dep. at 104, 106-07 (testifying that the way the caller said the phrase "you know what I mean" sounded like how Blesedell said that phrase; "I've heard Jason make that statement many times.  That sounds like Jason Blesedell in the recording.").  Morgan further believed that the caller's insistence on having a ticket number and his repeated references to December 4 "sounded like somebody was trying to cover themselves."  (Id. at 113).  Ervin too believed that the caller was Blesedell.  (Ervin Dep. at 91).  After the termination meeting, Morgan and Ervin asked Blesedell three times if he was the caller.  "Jason wouldn't answer.  Matt asked him again, is that you on the recordings.  Jason didn't answer.  The third time Jason said that's Brad Carroll.  He never said, that's not me."  (Morgan Dep. at 113-14).

At Blesedell's request, Morgan spoke to Carroll briefly by phone.  (Morgan Dep. at 111-12).  Morgan believed that Carroll did not sound like Blesedell.  (Id. at 105, 112 ("When I spoke to Brad Carroll, he sounded older, and he had a higher pitched voice.")).

### 2. Step 3 Grievance and the Decision not to Arbitrate

On January 3, 2013, the Union filed a written grievance under Step 3 of the CBA's grievance procedure.  (Blesedell Dep., Ex. 18).  CTC and the Union held a Step 3 meeting on January 7.  Blesedell did not attend the meeting, despite indicating his interest in attending to Morgan.  (Morgan Dep. at 145).  Morgan claims that he asked Stevens about Blesedell being allowed to attend but Stevens "didn't want him in the building."  (Id.).  During the meeting, CTC reviewed the evidence with the Union, explained its grounds for terminating Blesedell, and affirmed its decision to terminate him.  (Morgan Dep. at 149-53; Stevens Dep., Ex. 9 at LU000003 (January 10, 2013 letter reflecting CTC's affirmance of termination)).

The Union's Grievance Committee met on January 24, 2013.  (Morgan Dep. at 158-59).  The meeting was attended by Morgan, Ervin, steward Troy Elliot, treasurer Todd Shoultz, and financial secretary Clint Stoller.  (Elliot Dep. at 19; Shoultz Dep. at 13; Stoller Dep. at 16-17).  Also in

attendance was Dave Appleman, a representative from the International Union, who shared his experience with similar cases. (Morgan Dep. at 179; Ervin Dep. at 73). Morgan presented to the Committee the evidence that CTC and the Union had gathered regarding Blesedell. (Ervin Dep. at 64; Elliot Dep. at 46-47). Upon hearing the recordings from the caller identifying himself as the Carrolls, the Committee members believed that the caller was Blesedell because the voice sounded like his, the caller "used mannerisms that [Blesedell] always uses," and "[t]here was lingo or jargon that was used that a customer just would not know those words." (Elliot Dep. at 34; Shoultz at 30-31; Stoller Dep. at 37-38). The Committee also concluded that Blesedell's account of what he did on December 4 conflicted with the evidence, including the GPS records, and the Committee was concerned that Blesedell had changed his story "a couple [of] times" and had caused a trouble ticket regarding the pedestal to be modified after-the-fact. (Stoller Dep. at 40, 48; Elliot Dep. at 27, 35-36; Shoultz Dep. at 28). The Committee also examined information it had received from CTC regarding the incident with Dustin Riehle,[7] as well as a handful of other customer complaints that had been made against Blesedell. (Morgan Dep., Ex. 50; Ervin Dep. at 72; Shoultz Dep. at 34-35; Stoller Dep. at 44, 46).[8]

The Union asked CTC to hold the Step 3 grievance open while the Union determined what weight, if any, could be given to an unemployment benefits decision in Blesedell's favor by the Ohio Department of Job and Family Services. (Morgan Dep., Ex. 50, Ex. 53 at 000054; Blesedell Dep., Ex. 19). The Union was soon thereafter advised that the decision would not be admissible at arbitration. (Morgan Dep. at 189-90). Appleman further advised Morgan that he "[did] not believe we have a case that is winnable in arbitration," based on, among other things, the "taped conversations, doubt about altering a trouble ticket," and public complaints against Blesedell. (Morgan Dep., Ex. 52 at LU000643).

The Grievance Committee held a second meeting after having received the advice from the International Union and Appleman. (Elliot Dep. at 46; Shoultz Dep. at 17). The Committee voted not to take the grievance to arbitration. (Elliot Dep. at 47). The Committee concluded that the evidence "didn't support Jason's claims" and came out "in the company's favor." (Id. at 49). Of particular importance to the Committee's decision was "Blesedell's inability to prove where he was

---

[7]     Concerning the Dustin Riehle incident, Blesedell told Morgan by email, "I refuse to comment on his baseless allegations." (Morgan Dep., Ex. 52 at LU000645).

[8]     Elliot had no recollection of having discussed such information. (Elliot Dep. at 25-27).

through the documents," the GPS records, his efforts "to get dates changed on the trouble tickets," and the recordings in which the Committee believed Blesedell was impersonating Brad Carroll. (Id. at 47-48).

The Union notified Blesedell on January 30, 2013 that it would not take his grievance to arbitration. (Morgan Dep. Ex. 53 at 000055).

### G. Police Report

On January 30, 2013 Blesedell contacted the Ross County Sheriff's Office and reported the Dustin Riehle incident to Deputy Jenna Hornyak. (Hornyak Aff., Ex. A). According to the report, "Jason stated that he now needed a report because he is now fired from his previous employment area because of the [Riehle] situation." (Id.). Hornyak then contacted Stevens, who, according to the report, "stated that Jason got fired because of statements from individuals telling him that Jason was selling parts for drugs." (Id.).

In March 2013, Riehle was charged with a count of misdemeanor menacing relating to the incident, and he pleaded no contest to the charge. (Morgan Dep., Ex. 57).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.   Section 301 Claim

In order to prevail on his hybrid Section 301 claim, plaintiff must demonstrate both a breach of the collective bargaining agreement by the employer and a breach of the duty of fair representation by the union. Garrison v. Cassens Transport Co., 334 F.3d 528, 538 (6th Cir. 2003); Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir. 1994). "Unless a plaintiff 'demonstrates both violations, he cannot succeed against either party.'" Garrison v. Cassens Transport Co., 334 F.3d at 538 (quoting Bagsby v. Lewis Bros. Inc. of Tenn., 820 F.2d 799, 801 (6th Cir. 1987)) (footnote omitted).

### A.   Whether CTC Breached the CBA

The CBA provides that CTC may discharge an employee for "just cause." (Stevens Dep., Ex. 1, Art. 7). The CBA does not define the term "just cause." In the absence of a contractual definition, courts typical hold that "just cause" means "'[a] cause outside legal cause, which must be based on reasonable grounds'" and for which "'there must be a fair and honest cause or reason, regulated by good faith.'" Highway & Local Motor Freight Employees Local Union No. 667 v. Wells Lamont Corp., 69 Fed. App'x 300, 305 (6th Cir. 2003) (quoting Black's Law Dict. 863 (1990)); accord Scott v. Anchor Motor Freight, Inc., 496 F.2d 276, 281 (6th Cir. 1974); In re Newman, No. 07-8050, 2008 WL 867756, at *5 (6th Cir. BAP March 28, 2008). Under the just cause standard, an

16

employer "has the authority to terminate any employee, as long as it follows its own guidelines and the termination is not arbitrary and capricious." Wells Lamont, 69 Fed. App'x at 305.

CTC has written "Rules of Conduct" that "have been recognized by the union as rules to follow." (Stevens Dep. at 30; Stevens Dep., Ex. 4). The Rules of Conduct provide the following as grounds for disciplinary or corrective action: "[i]nterfering in any manner with Company work performance, efficiency or discipline"; "[w]asting time . . . or avoiding available work"; "[s]topping work or making preparations for leaving work before the designated time"; and "[f]alsifying Company records in any manner." (Id.). These grounds were cited in the December 17, 2012 letter of termination issued to Blesedell by CTC. (Stevens Dep., Ex. 3).

CTC follows, when appropriate, a system of progressive discipline. (Stevens Dep. at 24-26; Coe Dep. at 19-20; Kendall Dep. at 44). Prior to December 2012, Blesedell had been involved in unrelated incidents for which he received no discipline. (Kendall Dep. at 41; Morgan Dep. at 180). CTC considers some infractions to be grounds for termination, without utilizing progressive discipline – "theft, fraud, falsification of records, misleading management," and physical assault. (Kendall Dep. at 46-47; Stevens Dep. at 26-27; Coe Dep. at 20). CTC believed that Blesedell's conduct justified termination and not a less severe form of discipline. (Stevens Dep. at 27; Kendall Dep. at 41).

In support of its motion for summary judgment, CTC argues that the evidence amply supports a finding that CTC had just cause to terminate Blesedell. CTC contends that Blesedell failed to prove that he performed any work on the afternoon of December 4, other than briefly driving to Brad Carroll's house to secure dropped wires. CTC argues that, more importantly, Blesedell committed at least three acts of dishonesty: submitting a timecard on December 4, 2012 indicating that he had done 4 hours of work in the afternoon on buried cable maintenance; altering the ticket generated on December 9 relating to a pedestal damages in a car accident; and impersonating a customer in the calls made to CTC on December 16. CTC cites several judicial and arbitration decisions for the proposition that acts of dishonesty and falsification of records are sufficient grounds to support just cause for termination. (Doc. 45 at 18, citing, *inter alia*, Ball v. Pet, Inc., Grocery Products Div., 870 F.2d 657, 1989 WL 25869, at *4 (6th Cir. March 13, 1989)).

CTC further argues that even if plaintiff now, after-the-fact, submits evidence showing that he performed some amount of work on December 4 and attempts to provide explanations for modifying the ticket and for the December 16 calls, CTC still had a honest belief, based on the evidence available at the time, that Blesedell had violated the Rules of Conduct. CTC argues that it

did not have a legal duty to "leave no stone unturned," and that its investigation of the matter was reasonable and that it arrived in good faith at a determination that Blesedell had committed serious infractions.

In response, plaintiff contends that he has submitted evidence demonstrating that he did in fact perform work on the afternoon of December 4, 2012.  In particular, he claims that he first did "C Box" cable work at the Exchange, then repaired the pedestal at Robinson's house, looked at the lines at Mankin's house, and later hung low lines at Carroll's house.  As to modifying the December 9 ticket, plaintiff contends that he has adequately explained that he had to work on the pedestal several times.  And as to the December 16 calls, he contends that he did not make those calls and that Carroll was the caller.  See Carroll Dep. at 51 (testifying that the voice in the first recording was his).

Plaintiff disagrees that CTC can use the "honest belief" doctrine as a defense to its termination decision.  He argues that the honest belief doctrine applies to shield employers only in discrimination suits and not in § 301 cases.  Further, plaintiff argues that such a defense should not be available to CTC because it failed to conduct an adequate investigation before terminating him.

As an initial matter, the court rejects plaintiff's contention that the court must conduct a post-hoc examination of the facts underlying CTC's decision to terminate him.  See Deats v. IUE-CWA, No. 3:11-cv-576, 2013 WL 1729367, at *3 (W.D. Ky. Apr. 22, 2013) ("Deats cannot maintain a viable claim that GE breached the terms of the CBA premised merely upon some dispute over the facts underlying GE's decision to terminate him.  In this regard, a genuine factual dispute over the facts relied upon by GE simply does not equate to a genuine factual dispute whether GE reasonably relied on those facts.").  Under the just cause standard – a standard that plaintiff agrees is correctly stated above (Doc. 56 at 35, citing Scott, 496 F.2d at 281) – the court's inquiry must be made with reference to what the employer had a good faith reason to believe was true at the time it exercised its power to terminate.  The Sixth Circuit directs courts to determine whether the employer had "reasonable grounds" and an "honest cause or reason regulated by good faith" for making the decision to terminate.  Wells Lamont, 69 Fed. App'x at 305.  See also Pierce v. Kaiser Found. Hosps., No. CV 09-3837, 2010 WL 4590930, at *16 (Nov. 4, 2010 N.D. Cal. 2010) (stating in a hybrid § 301 case, "The critical question is not whether plaintiff actually misappropriated the funds. Rather, it is whether Kaiser had a 'fair and honest' basis to terminate plaintiff.").

Though plaintiff correctly observes that the honest belief doctrine derives from the employment discrimination context, see Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 596

(6th Cir. 2014), the just cause standard shares ground with that doctrine.  See Deats, 2013 WL 1729367, at *3 (in a hybrid § 301 case, applying the honest belief doctrine because the just cause standard requires a court to examine the proffered basis for termination and the employer's good faith beliefs, as the court would do in an employment discrimination case).  This court thus agrees with CTC that the court should analyze the evidence available, or what a reasonable investigation under the circumstances would have made available, to CTC at the time it made the decision to terminate.  See id. at *4.  "In deciding whether an employer reasonably relied on the particularized facts before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action."  Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998).  See also Waddy v. Sears, Roebuck & Co., 97 F.3d 1463, 1996 WL 540163, at *4 (9th Cir. Sept. 24, 1996) (noting that at common law just cause is defined with reference what the employer has a fair or honest reason to believe and that courts should not interfere with the good faith exercise of managerial discretion).

Having reviewed the record concerning what information was reasonably available to CTC at the time of its decision, the court finds that CTC is entitled to summary judgment on the issue of whether it had just cause to terminate Blesedell's employment.  CTC began its examination of what Blesedell did on the afternoon of December 4, 2012 with the timecard he submitted.  He put on the timecard that he had performed 4 hours of work on buried cable maintenance, but Stevens found no ticket to support that claim.  Further, Stevens had listened to the call between Blesedell and dispatcher Mitchell from 11:39 a.m. on December 4 and knew that the dispatchers had not been assigning trouble tickets to Blesedell, at least not until Parker told dispatcher Barnes at 3:06 p.m. to assign tickets to Blesedell.  (Coe Dep. at 33, 105) (testifying that HR had listened to the call between Parker and Barnes).

Stevens then investigated the GPS records from Blesedell's truck, and the records established that Blesedell's truck was parked at the Exchange for all but about 15 minutes in the afternoon of December 4.  After consulting with Parker (Stevens Dep. at 130-31), Stevens believed that these records too contradicted Blesedell's claim of having done 4 hours of work on buried cable because work performed at the Exchange would have been reflected by a trouble ticket and because any buried cable work to be performed at the Exchange was outside of Blesedell's job classification.

Plaintiff contends that he was qualified to perform cable work at the Exchange, and he cites Parker's deposition testimony in support.  But plaintiff's brief mischaracterizes Parker's testimony.

Parker admitted that Blesedell was qualified, in the sense that he was competent to perform the work. (Parker Dep. at 130). But Parker testified that such work was "not [within] his job classification at that time" and, as such, tickets would not have been assigned to Blesedell. (Id. at 131). In any event, no ticket existed to reflect that Blesedell had performed work at the Exchange on December 4.

At the December 14, 2012 fact finding meeting, CTC provided Blesedell with an opportunity to respond to its concern that his December 4 timecard misrepresented that he had performed 4 hours of work. CTC presented to Blesedell the evidence that it had gathered. Blesedell gave an explanation that perhaps he had helped Mark Tanner that afternoon. CTC consulted Tanner and checked its records and found no support for Blesedell's explanation.

The next explanation Blesedell offered was that he had worked on a pedestal that had been damaged in a car accident. Stevens investigated that claim as well, and what he found was a ticket that had been entered originally on December 9 on a report of a pedestal being damaged in an "auto accident." (Stevens Dep., Ex. 5). Having had just questioned Blesedell an hour or two before in the fact-finding meeting about his work on December 4, Stevens noticed a modification to the ticket indicating the work was actually done on "Dec. 4th in afternoon." (Id.). Stevens reasonably viewed this modification with suspicion, and once again he took the time to investigate the matter through records reasonably available to him. He saw that the ticket had been entered in the normal course by a dispatcher, and he found a recording in which Blesedell himself called in on December 9 to report that the pedestal had been damaged in a car accident that weekend, and not on December 4 as the modification stated. This information, along with Blesedell's call clearing the ticket on December 10, confirmed for Stevens that the ticket legitimately related to work done to fix a damaged pedestal on December 10. Important too was the fact that the modification was not accompanied by a dispatcher's code. Stevens continued his investigation by calling the dispatcher who had originally entered the ticket and a dispatcher Stevens knew to work frequently with Blesedell. Neither one of the dispatchers was aware of the modification.

In his brief, plaintiff argues that he told Stevens in a phone call at approximately 4:36 p.m. on December 14, 2012 that the pedestal on Massieville Road had been hit twice and that the records did not so reflect. (Stevens Dep. at 184). Plaintiff argues further that he told Stevens in the December 14 phone call about the December 9 ticket and explained that it related to work he performed on December 4. (Id.; Stevens Dep., Ex. 9 at LU000007). But plaintiff does not make the assertion, nor would the record support it, that he informed Stevens that he had called a dispatcher

to have the ticket modified. The phone call Blesedell made on December 9 – reporting to CTC that the pedestal had been damaged that weekend – directly contradicted the assertion that Blesedell was making in his December 14 call to Stevens that the December 9 ticket related to work performed on December 4. Moreover, Blesedell's claim of the pedestal being struck more than once did not comport with the modification that Stevens saw on the ticket. The modification did not state that there was more than one incident – that the damaged pedestal had been repaired by Blesedell on December 4 in addition to December 10. The modification stated, "Ped was damaged on Dec 4th and repaired Dec 4th in afternoon." (Stevens Dep., Ex. 5). Thus, Blesedell's statement to Stevens in the phone call was the latest in a series of claims made by Blesedell about what he did on December 4 for which Stevens could not find support in CTC's records. (Stevens Dep. at 184).

Plaintiff now faults Barnes for modifying the ticket rather than creating a new one. (Doc. 56 at 15). However, Blesedell himself instructed Barnes to "put the notes on there it was actually damaged on the 4th . . . [a]nd was repaired on the 4th." (Blesedell Dep. at 132-33). He never asked Barnes to create a new ticket or to indicate that work was performed on both the 4th and 10th of December.

Plaintiff also faults Stevens for not being thorough in his investigation because he failed to listen to the phone call between Blesedell and Barnes. Plaintiff contends that had Stevens listened to the phone call with Barnes, it would have dispelled the notion that Blesedell must have hacked into the computer system in order to modify the ticket. However, plaintiff points to no evidence suggesting that Stevens knew or should have known that the phone call had taken place. Barnes did not put her initials on the modified ticket, and plaintiff does not claim that he told Stevens about his phone call to Barnes or about the modification, despite having had the opportunity to tell Stevens so during their phone call about an hour after the ticket was modified. And even if Stevens had listened to the phone call, it would not have helped Blesedell. CTC terminated Blesedell in part because he altered the ticket (falsified a record), not because he hacked the company's computer system. Though Blesedell did not enter the keystrokes himself, he plainly instructed Barnes to make the modification. Further, Blesedell stated in the call that the pedestal was actually damaged and repaired on December 4, again directly contradicting what Stevens knew Blesedell had said to dispatchers on December 9 and 10.

Turning to the calls received on December 16 from "the Carrolls," Stevens listened to the recordings and personally believed that the caller's voice sounded like Blesedell's voice. Stevens sought the opinions of Coe, Kendall and Parker, who all agreed in believing that the caller was

Blesedell.  They did not reach this conclusion arbitrarily, but rather based it on their own familiarity with Blesedell's voice, the caller's use of technical terms, the caller's references to December 4, and the caller's insistence that certain items be included in the ticket.

Plaintiff contends that CTC should have contacted Carroll to listen to his voice and ask if he had called on December 16.  This argument ignores Parker's testimony that that he was familiar with Carroll's voice and believed the caller sounded like Blesedell.  Further, CTC did not have a duty to leave no stone unturned in its investigation.  The caller, who was calling from Blesedell's phone, declined the dispatcher's request for a phone number where he could be reached, nor did he give an exact street address.  Further, plaintiff has not put forth evidence demonstrating that CTC, had it contacted Carroll, would have received a clear story about the calls.  In his deposition testimony, Carroll stated that he believed that he was the caller in the first recording, but testified that he did not recall calling back and, when asked if he made the call in the second and third recordings, he responded, "Not that I recall."  (Carroll Dep. at 34-35, 51).  Thus, even if Stevens had contacted Carroll and been told what Carroll said under oath at his deposition, that conversation would not have undermined his belief that it was Blesedell's voice in the second and third recordings.

In sum, CTC has submitted sufficient evidence demonstrating as a matter of law that it had just cause to terminate Blesedell's employment.  CTC has established, and plaintiff does not dispute, that multiple acts of dishonesty constitute just case for termination, both under the case law and under CTC's Rules of Conduct.  CTC has further demonstrated that Stevens in good faith determined, from the particularized facts that were reasonably available to him, that Blesedell had violated CTC Rules of Conduct by submitting a false time card for the afternoon of December 4, 2012, falsely modifying the December 9 ticket, and impersonating a caller on December 16.  Plaintiff has not submitted evidence supporting an inference that the conclusions drawn by Stevens were capricious, not honestly held, or not made in good faith.  CTC, on the other hand, has demonstrated that Stevens afforded Blesedell opportunities to present his side of the story, that Blesedell's story changed several times, and that Stevens, after having investigated available records and consulted other individuals for information, arrived at a reasonable conclusion that Blesedell had engaged in misconduct warranting termination.

### B.     Whether the Union Breached its Duty of Fair Representation

A labor union owes a duty to fairly represent members of the bargaining unit and "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  Vaca v. Sipes, 386 U.S. 171, 177

(1967).  "In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith."  Garrison, 334 F.3d at 538.  These "three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty." Black, 15 F.3d at 584.  "[A] union owes employees a duty to represent them adequately as well as honestly and in good faith."  Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 75 (1991) (citations omitted).  "There is no requirement, however, that the grievance process be 'error-free.'"  Garrison, 334 F.3d at 538.

        In addition to demonstrating that the union's actions were arbitrary, discriminatory, or in bad faith, a plaintiff must also establish that the impact of the Union's breach on the outcome of the grievance process was "substantial," Dushaw v. Roadway Express, Inc., 66 F.3d 129, 132 (6th Cir. 1995), such that the process was "'seriously *flawed* by the union's breach.'"  Black, 15 F.3d at 585 (quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570 (1976)) (emphasis added in Black).

        1.      **Arbitrary**

        "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational."  O'Neill, 499 U.S. at 67 (citation omitted).  "[A]n unwise or even an unconsidered decision by the union is not necessarily an irrational decision."  Walk v. P*I*E* Nationwide, Inc., 958 F.2d 1323, 1326 (6th Cir. 1992).  In order to prevail, "a plaintiff has the difficult task of showing that the union's actions were 'wholly irrational.'"  Garrison, 334 F.3d at 538-39 (quoting O'Neill, 499 U.S. at 78)).  "The 'wholly irrational' standard is described in terms of 'extreme arbitrariness.'"  Id. 539 (quoting Black, 15 F.3d at 585).  "Mere negligence," or "ordinary mistakes, errors, or flaws in judgment" do not satisfy the requirement.  Id. at 538 (citing United Steelworkers of Am. v. Rawson, 495 U.S. 362, 372-73 (1990); Walk, 958 F.2d at 1326).

        "[A] union must undertake reasonable investigation to defend a member from employer discipline."  Walk, 958 F.2d at 1326 (citing Hines v. Anchor Motor Freight, Inc., 424 U.S. 554 (1976)).  "When reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals."  Garrison, 334 F.3d at 539.  Thus, "[a]ny substantive examination of a union's performance . . . must be highly deferential . . . ."  Mains v. LTV Steel Co., 89 Fed. App'x 911, 918 (6th Cir. 2003) (quoting O'Neill, 499 U.S. at 78).

Plaintiff asserts that the Union acted arbitrarily because of its failings in three areas: not involving him in the grievance process, not conducting an independent investigation, and not contesting the allegations and evidence offered by CTC.  Plaintiff contends that the Union's failures resulted in CTC's version of events being accepted without challenge and without Blesedell having a sufficient opportunity to be heard.

The court finds as a matter of law that the Union's actions during the grievance process were not arbitrary.  Plaintiff characterizes the Union as having, in wholesale fashion, failed to act on his behalf.  The record, however, does not support such an inference.  The record establishes that the Union did involve Blesedell in the grievance process.  It consulted with him before the December 14, 2012 fact-finding meeting and communicated that CTC was inquiring about the validity of work Blesedell had reported doing on a particular day.  Plaintiff argues that Morgan, who admitted to knowing prior to the fact-finding meeting that CTC might consider falsification of a timecard to be a fireable offense, should have warned him about the seriousness of the situation and should have recorded the meeting.  But plaintiff does not point to any negative impact that resulted from Morgan's alleged failure to warn or failure to record.  CTC gave Blesedell an opportunity to explain the timecard, to respond to the evidence that it had gathered, and to offer any further explanations for what he did on the afternoon of December 4.

The Union attended and recorded the termination meeting on December 17, 2012.  The Union immediately initiated Steps 1 and 2 of the grievance process on Blesedell's behalf and asked Blesedell to prepare a written statement.  The Union reviewed his statement, as well as statements that Blesedell had gathered from Carroll, Mankin and Robinson.  Plaintiff argues that Morgan again failed to involve him when he declined to review a log that Blesedell kept of contemporaneous notes regarding the daily work tasks that he performed.[9]  (Blesedell Dep. at 395) (testifying that Morgan gave off the impression that the log did not seem important).  But Morgan did not deny him an opportunity to state his version of events.  To the contrary, Morgan instructed Blesedell to "write down what you think you can while it's fresh on your mind."  (Id. at 226).  Morgan is not alleged to have told Blesedell to refrain from reviewing his notes.  Indeed Blesedell himself chose not to

---

[9]  Blesedell testified that his log of notes was left at his work station at the Exchange and delivered to him, along with other personal belongings, shortly after his termination.  (Blesedell Dep. at 227-29).  In his first deposition, Blesedell testified that he thought he had disposed of the notes after the grievance process was over.  (Id. at 229).  He later discovered the log and produced it to defendants.  A second deposition of Blesedell was conducted after discovery of the log.

consult his log because, in his own words, "that log didn't reflect anything" and it "[w]asn't relevant." (<u>Id</u>. at 230). Blesedell testified that he was "[a]bsolutely" able to prepare a satisfactory written statement to Morgan without reviewing his log.[10] (<u>Id</u>. at 396).

Plaintiff next argues that the Union failed to involve him by not allowing him to attend the Step 3 meeting with CTC or the Union's Grievance Committee Meeting. Plaintiff misstates the record as to the Step 3 meeting – Stevens, not Morgan, denied Blesedell's request to attend. As to the Grievance Committee meeting, the Union has demonstrated that it is the Union's policy not to allow the grievant to attend. (Stoller Dep. at 30). The Union's policy in this regard did not breach its duty of fair representation. <u>See</u> <u>Higdon v. United Steelworkers of Am., AFL-CIO-CLC</u>, 706 F.2d 1561, 1562 (11th Cir. 1983) ("A union does not breach its duty of fair representation simply by failing to give the grievant-member an opportunity to attend and notice of a particular segment of the grievance process."); <u>Slovinec v. Communications Workers of Am.</u>, 860 F.Supp.2d 25, 29 (D.D.C. 2012) (same).

Finally, as it concerns a purported failure by the Union to involve Blesedell in the grievance process, plaintiff claims that Morgan failed to provide the Grievance Committee with documents that he had given Morgan. This argument mischaracterizes the record. The Committee members testified that Morgan provided them with "a whole packet of documents," including documents Blesedell had supplied. (Stoller Dep. at 26, 42; Elliot Dep. at 21). To the extent the members could not recall seeing a specific document, they testified that Morgan presented to them the substance of the information contained in the document. (Stoller Dep. at 26-28; Shoultz Dep. at 28).

Turning now to plaintiff's allegation that the Union failed to adequately investigate his grievance, the court again finds that the record does not support a finding that the Union breached its duty of fair representation. Here, the reasonableness of the Union's investigation must be viewed in relation to the thoroughness of CTC's investigation. As detailed above, CTC gathered all

---

[10]     Furthermore, plaintiff has not established that the log contained information that would have substantially supported his grievance. Blesedell's notes for December 4, 2012 reference the work he did in the morning by ticket number. (Blesedell Dep., Ex. 23 at 000200). There is no ticket number listed for any afternoon work, and, in tension with Blesedell's written statement for the Union, the log contains no mention of work performed on cables at the Exchange or work done for Mrs. Mankin. The log does note a report of downed lines on Moss Hollow Road (<u>id</u>. at 000201), but this information would not have substantially supported the grievance because it duplicates the written statement submitted by Carroll and because CTC credited as true (based on the GPS reports) Blesedell's statement that he had fixed the downed lines.

reasonably available information regarding Blesedell's work on December 4, the modified December 9 ticket and the calls received December 16.  The Union requested, received, and reviewed the evidence from CTC.  The Union also obtained written statements from Blesedell, Robinson, Carroll and Mankin.  Morgan spoke to Carroll and visited the area where Robinson and Mankin lived.  The Union also consulted with a representative from the International Union.

Plaintiff contends that Morgan should have personally talked to Robinson and Mankin about the work Blesedell did on December 4.  He further alleges that Morgan should have, when he talked to Carroll, asked him if he made the calls on December 16.  In an optimal investigation Morgan perhaps would have interviewed these three individuals, but the court finds that his decision not to do so is not so far outside a wide range of reasonableness as to be irrational.  Importantly, Morgan did gather information from each of these three sources – he had written statements from all three individuals and he spoke to Carroll enough to hear what his voice sounded like.

Further, the evidence before Morgan indicated that there was not a reasonable likelihood that interviewing the individuals would lead to discovery of evidence which would substantially advance Blesedell's grievance.  From his site visit to the pedestal, Morgan believed it not to be credible that Blesedell would have walked to repair the pedestal rather than take his truck and equipment.  And Blesedell's written statement entirely omitted any mention of having worked on the pedestal.  Morgan also did not believe – based upon his site visit, review of GPS records, and reading of Robinson's and Mankin's statements – that Blesedell would have had sufficient time to repair the pedestal and visit Mankin's house.  Moreover, Blesedell's late-added claim that he performed worked at Mankin's house was not consistent with what he had told CTC and was not supported by the existence of a ticket.  As to Carroll, Morgan believed the voice and the language of the caller sounded like that of Blesedell and like someone "trying to cover themselves," and he failed to get a satisfactory answer from Blesedell when Morgan and Ervin asked him if it was his voice on the recordings.  Thus, the court finds that Morgan's decision that it would not be worthwhile to pursue additional information from Robinson, Mankin and Carroll was not irrational or arbitrary.  See Walters v. Local Union No. 337, 7 F.Supp.2d 885, 893 (E.D. Mich. 1998) (holding that a court should not review Union's factual and credibility determinations for correctness, but for whether they are rational).

Finally, as to an alleged failure to investigate, plaintiff contends that Morgan should have talked to him and to Dustin Riehle to get a better understanding of what occurred on December 14, 2012.  The court finds that it was not irrational for Morgan to decline to further investigate the

matter.  Morgan felt no need to investigate the matter any further because he had listened to Blesedell's call to Stevens in which Blesedell gave "his side of the story."  (Id. at 184).  Morgan believed that the mere existence of the call from Riehle complaining to CTC about Blesedell, whether true or not, "wouldn't go over very well" at arbitration.  (Morgan Dep. at 184; Morgan Dep., Ex. 52 at LU000643).  Morgan's conclusion as to the Riehle incident is not irrational.

The court likewise finds that the Union did not act arbitrarily by failing to contest the assertions presented by CTC.  Plaintiff's argument in this regard is that Morgan did not present CTC with the written statements from Blesedell, Robinson, Mankin and Carroll.  (Morgan Dep. at 215).  "[I]f a union fails to present favorable evidence during the grievance process, this failure may constitute a breach of its duty only if that evidence probably would have brought about a different decision."  Black, 15 F.3d at 585.  The record does not support an inference that the written statements would have resulted in a different outcome.  At best, the written statements provided a minimal explanation for what Blesedell did on the afternoon of December 4; they did not refute CTC's determinations that he had falsified a timecard by entering a code for buried cable work, improperly modified the December 9 ticket and impersonated a customer in the December 16 calls.  As Morgan testified, he simply did not find any evidence that contradicted CTC's determinations and could have formed the basis for a challenge by the Union.  (Morgan Dep. at 140; see also Elliot Dep. at 49).

### 2.    Discriminatory

A union breaches its duty of fair representation if it engages in invidious discrimination that is "'intentional, severe, and unrelated to legitimate union objectives.'"  Merritt v. Int'l Ass'n of Machinists and Aerospace Workers, 613 F.3d 609, 619 (6th Cir. 2010) (quoting Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 301 (1971)).

The sole basis of plaintiff's discrimination claim is the unsupported assertion that Blesedell's grievance is the first one that the Union has refused to take to arbitration.  During discovery the Union identified two individuals whose grievances Morgan declined to take to arbitration.[11] (Morgan Dep. at 44-48; Morgan Dep. Ex. 47, Response to Interrog. No. 7).  In neither instance did the member request that the grievance be dropped.  (Morgan Dep. at 254-56).  Thus, plaintiff has not put forth evidence supporting an inference that the Union discriminated against him by

---

[11]    The Union also identified a third individual whose grievance it did not take to arbitration, prior to Morgan's time as Union President.  (Morgan Dep. Ex. 47, Response to Interrog. No. 7).

engaging in "an unprecedented departure from past practice." Linton v. United Parcel Serv., 15 F.3d 1365, 1373 (6th Cir. 1994) (holding that "union's failure to process Linton's claim represented an unprecedented departure from past practice" and could constitute a breach of the union's duty of fair representation).

### 3.     Bad Faith

A union breaches its duty of fair representation if it acts in bad faith, which has been defined as "'an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, and other intentionally misleading conduct.'" Merritt, 613 F.3d at 619 (quoting Spellacy v. Airline Pilots Ass'n–Int'l, 156 F.3d 120, 126 (2d Cir. 1998)).

Plaintiff argues that his grievance was dropped in order to serve Morgan's personal interests, namely, his "desire to preserve his own power in the Union" and "his desire to facilitate his personal relationship with the management of CTC." (Doc. 56 at 44). Plaintiff's theory is twofold: first, that Morgan saw Blesedell as a threat to his power, in that Morgan had previously removed Blesedell as a union steward; and second, that Morgan hoped that cooperating with CTC would further his interest in job advancement with the company.

The court finds that the Union is entitled to judgment as a matter of law as to plaintiff's allegation of bad faith. Plaintiff's theory is speculative. The record does not establish when and for how long Blesedell served as a steward, (Blesedell Dep. at 313; Morgan Dep. Ex. 47, Response to Interrog. No. 6), but at some point Morgan removed him because Morgan understood that Blesedell had said that "he [Blesedell] ran the union." (Morgan Dep. at 156). Morgan acted out of concern that Blesedell would attempt to undermine his authority as Union President. (Id.). Morgan denied that the removal of Blesedell as steward influenced his handling of Blesedell's grievance, and plaintiff has failed to submit any evidence to support a reasonable inference otherwise. (Id. at 157) (testifying that he had "no ill-will, no dislike, no bias, anything against Jason Blesedell"). See Deats, 2013 WL 1729367, at *7 (holding that evidence of a prior "run-in" between plaintiff and the union president did not, without more, support an inference that the union acted in bad faith in deciding not to take a grievance to arbitration).

Likewise unsupported is plaintiff's claim that Morgan cooperated with CTC regarding Blesedell's termination in order to enhance his chances for advancement at CTC. Morgan testified that he applied for the position of General Manager of Operations at CTC in 2011 and did not receive the job because he was not "the right fit." (Morgan Dep. at 23-24). Morgan testified that he did not have a continued interest in a management job and that his pursuit of the General Manager

position did not hinder the discharge of his Union President duties.  (Id. at 25-26).  Plaintiff has failed to submit any evidence that would support a reasonable inference that Morgan's interest in the General Manager position contributed to the Union's decision to not take Blesedell's grievance to arbitration.

### C. Summary

The court thus finds that defendants are entitled to summary judgment as to both prongs of plaintiff's hybrid Section 301 claim.

## IV. Defamation Claims

Defamation is a "false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." Sweitzer v. Outlet Communications, Inc., 133 Ohio App.3d 102, 108, 726 N.E.2d 1084, 1088 (Ohio Ct. App. 1999).  A plaintiff asserting a claim for defamation must establish: (1) that defendant made a false statement of fact about the plaintiff, (2) that the statement was defamatory, (3) that the statement was published without privilege, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.  Am. Chem. Soc. v. Leadscope, Inc., 133 Ohio St.3d 366, 389, 978 N.E.2d 832, 852 (Ohio 2012); Thomas v. Cohr, Inc., 197 Ohio App.3d 145, 151, 966 N.E.2d 915, 920 (Ohio Ct. App. 2011).

### A. Statement to Deputy Hornyak

According to a report written by Ross County Sheriff Deputy Jenna Hornyak on January 30, 2013, Stevens told her that "Jason got fired because of statements from individuals telling him that Jason was selling parts for drugs."  In presenting his defamation claim, however, plaintiff characterizes Stevens as having said that "Blesedell was fired for selling parts for drugs."  (Doc. 56 at 46).  Plaintiff argues that this statement was defamatory because it stated that he was dealing drugs and that Stevens made the statement with a reckless disregard for the truth.  (Stevens Dep. at 104) (admitting that he had no evidence showing Blesedell had sold drugs and that he never investigated the matter).

Plaintiff's claim fails for two reasons.  First, the statement Stevens made was not false, at least not in the sense argued by plaintiff.[12]  Dustin Riehle did in fact accuse Blesedell of dealing

---

[12]     There is a sense in which the statement was false.  CTC terminated Blesedell's employment not because of the Dustin Riehle incident, but because it determined that he had falsified a timecard, improperly manipulated a ticket and made phone calls impersonating a customer.  If Stevens told

drugs. Defendants have submitted unrebutted evidence, in the form of an audio recording, establishing that Riehle called CTC on December 14, 2012 and accused Blesedell of "snorting a pill" and "hooking people up on their cable too down there for pills." (Stevens Aff., Ex. A). Stevens did not tell Deputy Hornyak that Blesedell was in fact dealing drugs, only that he had been so accused by someone else. After speaking with Deputy Hornyak, Stevens then faxed the notes he kept from the Riehle incident to Deputy Hornyak. (Stevens Dep. at 103; Stevens Dep., Ex. 20 at CTC00360). His notes too made clear that it was Riehle, not Stevens, who had accused Blesedell of dealing in pills.[13] See Leadscope, 133 Ohio St.3d at 389, 978 N.E.2d at 853 (holding that a court, in determining whether a statement is defamatory, must look to the "entire publication" and "totality of the circumstances" and should not consider a statement "in isolation").

Second, the statement Stevens made is entitled to a qualified privilege. Blesedell contacted Deputy Hornyak at 4:05 p.m. on January 30, 2013 to report the incident with Riehle that had occurred on December 14, 2012. (Hornyak Aff., Ex. A). After speaking with Blesedell, Deputy Hornyak then contacted Stevens at 4:35 p.m. as part of her investigation of the incident. (Id.; Stevens Dep. at 99). A qualified privilege applies to allegedly defamatory information that is supplied to law enforcement authorities. Graham v. Best Buy Stores, L.P., 298 Fed.App'x 487, 498-

---

Deputy Hornyak that the Riehle incident is why CTC fired Blesedell – a point he denies (Stevens Dep. at 103) – then his statement was false. But plaintiff has not argued or demonstrated how a misstatement as to the reason for CTC's personnel decision to terminate him was defamatory or caused him injury. Indeed, Deputy Hornyak's notes reflect that plaintiff himself had told her that he had been fired because of the Riehle incident. (Hornyak Aff., Ex. A). Thus, plaintiff published the false statement to Deputy Hornyak 30 minutes before Stevens did.

[13]    There are two potential variances from the Riehle call to what Stevens is reported by Deputy Hornyak as having said. Deputy Hornyak wrote that Stevens said there were "individuals" – in the plural – who accused Blesedell of dealing in pills, when Riehle was the only individual who had made that accusation. And she wrote that Stevens said that Blesedell had been accused of selling "parts" for drugs, when Riehle had accused him of trading cable for pills.

Plaintiff does not rely on either of these variances as supporting his defamation claim. Moreover, the notes Stevens faxed to Deputy Hornyak clarified that Riehle was the individual making the accusation and that he was accusing Blesedell of "trading cable for pills." (Stevens Dep., Ex. 20 at CTC00360. In light of the totality of what Stevens communicated to Deputy Hornyak, his statements were substantially true and thus not defamatory. See National Medic Services Corp. v. E.W. Scripps Co., 61 Ohio App.3d 752, 755, 573 N.E.2d 1148, 1150 (Ohio Ct. App. 1989); Baxter v. Sandusky Newspapers, Inc., No. E-11-006, 2012 WL 1018841, at *5 (Ohio Ct. App. March 23, 2012) (holding that the publication "need not be literally true to receive protection. It is enough if the publication is substantially true. That means the gist or sting of the defamation must be true even if details are not") (citation and internal quotation marks omitted).

99 (6th Cir. 2008); Snell v. Village of Bellville, No. 1:11-cv-1744, 2011 WL 5361120, at *10, (N.D. Ohio Oct. 28, 2011); Atkinson v. Stop–N–Go Foods, Inc., 83 Ohio App.3d 132, 136, 614 N.E.2d 784, 786 (Ohio Ct. App. 1992); Greer v. Nat'l City Corp., No. 08 CAE 12 0076, 2009 WL 3119968, at *9 (Ohio Ct. App. Sept. 28, 2009). To defeat the privilege, plaintiff must prove that the published statements were untrue and made with actual malice, which requires proof by clear and convincing evidence that the defendant, acting with ill will or spite, made the statements either with knowledge that they were false or with reckless disregard for their truth. Jacobs v. Frank, 60 Ohio St.3d 111, 115-16, 573 N.E.2d 609, 614 (Ohio 1991). Plaintiff has not established by clear and convincing evidence that Stevens acted with actual malice. Rather, plaintiff has shown only that Stevens had no knowledge that Blesedell had sold drugs and that he did not investigate the matter. But again, Stevens did not state that Blesedell was dealing drugs; he merely reported the accusation that Riehle had made against Blesedell, with no suggestion as to whether or not the accusation was true.

**B.     Statements to the Union**

Plaintiff alleges that Stevens made defamatory statements to the Union when he shared with Morgan the accusations that Riehle had made against Blesedell. At the December 19, 2012 Step 2 grievance meeting, Stevens played for Morgan the recording of Riehle's phone call to CTC. (Morgan Dep. at 124). Stevens and Morgan discussed the Riehle call at the January 7, 2013 Step 3 meeting,[14] and Stevens provided Morgan with his notes about the Riehle incident. (Morgan Dep. at 150, 168; Stevens Dep., Ex. 7)).

As with the statement made by Stevens to Deputy Hornyak, plaintiff has not established that Stevens made a false statement to the Union. The Riehle recording and Stevens's notes make clear that it was Riehle, not Stevens, who had accused Blesedell of dealing drugs. Plaintiff has merely shown that Stevens published the fact that the accusation had been made, not that Stevens was making the accusation or suggesting that it was true.

Plaintiff also alleges that Stevens made a defamatory statement when he told the Union that he believed Blesedell had directly manipulated the December 9, 2012 ticket. (Stevens Dep. at 55). During the grievance process, Stevens instructed an employee, who had the same access to CTC's computerized ticket system as Blesedell did, to log in to the system and attempt to modify a closed ticket. (Id. at 38-40). Stevens found that the employee was able to modify the ticket. (Id.; Stevens

---

[14]     Plaintiff does not point to any specific statements made during the Step 3 meeting by Stevens to Morgan as being defamatory, and the deposition testimony cited by plaintiff establishes only that they "discussed" the call Riehle made to CTC. (Morgan Dep. at 150).

Dep., Ex. 9 at LU000088-89).  From this test, Stevens concluded that Blesedell manipulated the December 9 ticket himself.  (Id. at LU000090).  Stevens shared this test and his conclusion with the Union at Step 3 of the grievance process, but he also told the Union that he could not definitely prove that Blesedell had manipulated the ticket.  (Stevens Dep. at 40, 55).

Defendants argue that the communications Stevens made to the Union about the modification of the December 9 ticket are subject to a qualified privilege.  The court agrees.  CTC had a statutory duty under Section 8(a)(5) of the National Labor Relations Act to provide the Union with all information necessary and relevant to the Union's performance of its duties to represent an employee in a grievance.  NLRB v. Acme Indus. Co., 385 U.S. 432 (1967); General Motors Corp., Inc. v. N.L.R.B., 700 F.2d 1083, 1088 (6th Cir. 1983); Globe Bus. Furniture, Inc. v. N.L.R.B., Nos. 88-6044, 88-6103, 1989 WL 140174, at *6 (6th Cir. Nov. 21, 1989).   Information concerning the modification of the ticket was necessary and relevant to the grievance because CTC's determination that Blesedell had manipulated the ticket was one reason for his termination.   Under Ohio law, communications made pursuant to a duty to provide information are protected by a qualified privilege.  Hahn v. Kotten, 43 Ohio St.2d 237, 245-46, 331 N.E.2d 713, 719-20 (Ohio 1975).  Though not addressing the exact issue before this court, Ohio courts have applied a qualified privilege to communications made by employees to union stewards, see Gintert v. WCI Steel, Inc., No. 2002-T-0124, 2007 WL 4376178, at *5 (Ohio Ct. App. Dec. 14, 2007), communications made in the course of union grievance procedures, see Gray v. Allison Division, General Motors Corp., 52 Ohio App.2d 348, 351, 370 N.E.2d 747, 751 (Ohio Ct. App. 1977), and communications made by a company to the union (outside the grievance process) about an employee's dismissal, see Holloman v. Rutman Wine Co., 11 Ohio App.3d 257, 258, 464 N.E.2d 180, 182 (Ohio Ct. App. 1983).

Plaintiff can overcome the privilege by showing that the communications were untrue and made with actual malice.  Jacobs, 60 Ohio St.3d at 115-16, 573 N.E.2d at 614.  Plaintiff argues that Stevens now acknowledges that Blesedell did not directly manipulate the December 9 ticket and that he was reckless in not reviewing the December 14 phone conversation between Blesedell and Barnes.  However, the court finds that Stevens's conclusion that Blesedell had manipulated the ticket was substantially true – the ticket was in fact altered at Blesedell's direction.  As discussed above, Stevens may have been incorrect as to how Blesedell manipulated the ticket (directly entering the alterations into the system versus instructing a dispatcher to enter the alterations), but he correctly determined that Blesedell was responsible for the ticket being manipulated.

The court further finds that Stevens did not act with reckless disregard for the truth.  Again, as discussed above, Stevens was not aware of the phone call between Blesedell and Barnes, and plaintiff does not establish that a reasonable investigation would have uncovered the recording, particularly when Blesedell failed to disclose the matter to Stevens.  Stevens investigated all of the evidence reasonably available to him and took the extra step of running a test to determine if Blesedell's level of computer access would have allowed him to alter the ticket.  The court finds as a matter of law that Stevens was not acting with reckless disregard for the truth when he communicated to the Union that Blesedell had manipulated the December 9 ticket.

## V.  Conclusion

For the reasons stated above, the motions for summary judgment filed by CTC and the Union (docs. 45 and 46) are GRANTED in their entirety.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge


DATE: May 1, 2015